**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 16 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

THERESA CHRISTIANSEN, individually
and as personal representative of the Estate
of Sean Michael Christiansen, deceased;
MEAGAN THOMPSON, on behalf of and
for the benefit of Meagan Thompson, as a
claimant to the estate, and in her individual
capacity as widow, and Avery Christiansen,
by and through her next friend, Meagan
Thompson, as a claimant to the Estate and in
her individual capacity as daughter,

      Plaintiffs - Appellants,

v.

CITY OF TULSA, a municipality; RONALD
PALMER, acting individually and in his
capacity as chief of police, Tulsa Police
Department, John Doe, SOT Supervisor
acting in his capacity as Head of Special
Operations Unit of the Tulsa Police
Department; John Doe Officers I, II, III, IV,
V and VI, acting as members of the Tulsa
Police Department; JOHN DOE, SOT
Supervisor acting individually and John Doe
Officers I, II, III, IV, V, and VI, acting in
their individual capacities;
PSYCHOLOGICAL SERVICES FOR THE
TULSA POLICE & FIRE DEPARTMENTS,
INC., an Oklahoma Professional
Corporation; DOUGLAS GENTZ, sued as
Dr. Douglas Gentz, Ph.D., as President of the
Psychological Services for the Tulsa Police
& Fire Departments, Inc., and as an

No. 02-5135

individual acting on behalf of the City of
Tulsa,

Defendants - Appellees.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D. Ct. No. 01-CV-372-B)**

Bruce Schultz, Sapulpa, Oklahoma, (Tom C. Lane, Sapulpa, Oklahoma, James O. Goodwin, Tulsa, Oklahoma, and Allen Mitchell, Sapulpa, Oklahoma, with him on the briefs), appearing for Appellants.

Marthanda J. Beckworth, Atkinson, Haskins, Nellis, Holeman, Phipps, Brittingham & Gladd, Tulsa, Oklahoma, appearing for Appellees Gentz and Psychological Services.

Larry V. Simmons, Assistant City Attorney (Martha Rupp Carter, City Attorney, and John E. Dorman, Senior Assistant City Attorney, with him on the brief), Tulsa, Oklahoma, appearing for Appellees City of Tulsa and Chief Ronald Palmer.

Before **TACHA**, Chief Circuit Judge, **BRISCOE**, Circuit Judge, and **SHADUR,**[*] District Judge.

**TACHA,** Chief Circuit Judge.

---

[*] Honorable Milton I. Shadur, Senior District Judge for the Northern District of Illinois, sitting by designation.

Plaintiffs Theresa Christiansen, individually and as personal representative of the estate of Sean Michael Christiansen, Meagan Thompson, and Avery Thompson, brought this suit under 42 U.S.C. § 1983 against defendants (1) the City of Tulsa, (2) Ronald Palmer, Tulsa Chief of Police, (3) Dr. Douglas Gentz, Ph.D., and (4) Psychological Services for the Tulsa Police & Fire Departments,[1] alleging constitutional violations under the Fifth and Fourteenth Amendments. The district court granted defendants' respective motions for summary judgment, concluding that plaintiffs' allegations failed to establish a constitutional violation. For the reasons set forth below, we AFFIRM.

## I. Background

On the morning of August 24, 1999, at approximately 8:58 A.M., Meagan Thompson telephoned 911 and reported that her husband, Sean Christiansen, was armed with a loaded .38 caliber pistol and AK 47 and had threatened to kill her and commit suicide. After contacting the police, Thompson left the apartment with their infant child, Avery Thompson.

Christiansen, who was twenty-three years old, had a history of psychiatric problems. Dr. David Crass, M.D., a Tulsa psychiatrist, was treating Christiansen

---

[1] Although plaintiffs' complaint lists Dr. Gentz and Psychological Services for the Tulsa Police & Fire Departments individually, we treat them collectively for purposes of this appeal. Plaintiffs' complaint also listed several "John Doe" defendants; the only parties before this court, however, are those set forth above.

for Attention Deficit Hyperactivity and Oppositional Defiant Disorder.  During the days leading up to the incident, Christiansen had experienced problems with a new medication prescribed by Dr. Crass.  On the day in question, Christiansen had taken "20-30 Xanex [sic] pills '2-2.5' milligrams, and had been drinking beer."

At approximately 9:00 A.M., Tulsa Police Department ("TPD") officers arrived at Christiansen's apartment.  Upon arrival, Sergeants Nick Cory and Kirk Hewitt spoke to Christiansen on the telephone for approximately fifteen minutes.  Christiansen told Sergeant Hewitt that he had "armor piercing ammunition" for the AK 47 and that "he was going to start shooting and [the Tulsa Police Department had] just entered into a war."  Sergeant Cory instructed the officers to set up a perimeter around the apartment building and evacuate persons in the neighboring apartment units.  At 9:53 A.M., the TPD activated its Special Operations Team ("SOT").

TPD officers called Dr. Douglas Gentz, Ph.D., a licensed psychologist, to assist the SOT in their negotiations with Christiansen.  Dr. Gentz was under contract with the City of Tulsa to provide certain psychological services and counseling to Tulsa's police and fire departments and "operational assistance and support such as consulting for the [TPD's SOT]." [1]

---

[1] According to Dr. Gentz, he "routinely respond[ed] when the [SOT] [was] activated."

While at the scene, Dr. Gentz assisted the TPD officers by generating a psychological profile of Christiansen. In order to obtain information relating to Christiansen's psychological history and his condition, Dr. Gentz interviewed both Thompson and Dr. Crass. During their conversation, Dr. Crass requested to speak with Christiansen [2] and gave Dr. Gentz a pager number where he could be reached. During this initial conversation, Dr. Gentz informed Dr. Crass of the TPD's policy of controlling third-party communications during an armed standoff. Later in the day, after the standoff intensified, Dr. Gentz specifically instructed Dr. Crass not to contact Christiansen, fearing that third-party contacts might frustrate the negotiation effort. [3]

At approximately 11:48 A.M., TPD officers again established telephone contact with Christiansen. Negotiator Cole Butler was the TPD's "contact" person. Christiansen informed Negotiator Butler that he was armed with an AK

---

[2] Dr. Crass' notes taken shortly after the incident indicate that he offered, but did not request, to speak with Christiansen. In his May 21, 2002, affidavit, Dr. Crass contends: "I asked Gentz on several occasions if I could speak with Sean. Gentz said each time that it was not possible, and led me to believe Sean could not be contacted by telephone . . ., [explaining that] it was the customary practice of the TPD during armed standoffs to control contact between the armed subject and others." We assume for purposes of this appeal that Dr. Crass requested to speak with Christiansen.

[3] Based on Dr. Crass' recollection, "Dr. [Gentz] was making sure that I wasn't trying to do independent intervention at the same time he and the police were. I told him that we were not trying to intervene, but that I would be glad to help in any way."

47 with armor-piercing ammunition, a .38 caliber pistol, and an army knife. He told Negotiator Butler that he wanted to kill himself and that he was "not coming out of [t]here alive." He threatened to shoot anyone who tried to enter the apartment and repeatedly threatened to kill himself if anyone attempted to enter the apartment.

On at least two separate occasions during the standoff, Negotiator Butler asked Christiansen if he wanted to speak with Dr. Crass. Christiansen did not respond to either inquiry. [4] Butler also repeatedly offered Christiansen access to medical care, which he refused. Throughout the negotiation, Butler assured Christiansen that no one wanted to hurt him and advised him numerous times that

---

[4] At one point, Christiansen appeared to express frustration with Dr. Crass:

Q [Butler]: When you come out would you like to talk to Dr. [Crass] today?

A [Christiansen]: That's not a part of his deal.

Q: It's not part of his deal?

A: It's my life.

Q: Huh?

A: It's my life. I should have chosen to quit taking the medication, right? Right.

if he came out peaceably, TPD officers would take him for medical treatment.[5]

Further, Butler assured Christiansen that he would not be put in jail.[6]

Throughout the day, Christiansen continually asked Negotiator Butler to provide him with cigarettes. In making these requests, Christiansen would sometimes refer to his "last cigarette," stating at one point, "I just want[] to smoke my last cigarette." Butler made numerous attempts to persuade Christiansen to trade his weapons for cigarettes, but Christiansen would not agree. In the end, Butler refused to furnish Christiansen with cigarettes, fearing that if he did so, Christiansen would then kill himself. Butler did, however, tell Christiansen several times that he had a new pack of cigarettes and would give them to Christiansen if he would simply come out of the apartment.

At around 12:00 P.M., Sean Christiansen spoke to his mother, Theresa Christiansen, on the telephone. Theresa Christiansen arrived at the apartment shortly after the conversation and asked to see her son. The TPD officers denied her request. Christiansen had told Negotiator Butler that, "She brought me into this world, she should at least know why I'm leaving it, okay?" Negotiator Butler was concerned that allowing Christiansen to see his mother would give him an

---

[5] Negotiator Butler told Christiansen that he would be taken to Parkside Hospital in Tulsa.

[6] When Christiansen asked, "You guys are going to throw me in jail, right?", Butler responded, "No, you haven't committed a crime today."

opportunity to say "goodbye," after which he might follow through on his suicide threats. [7]  He repeatedly told Christiansen that he could see his mother if he came out of the apartment.

At one point during the standoff, Christiansen attempted to telephone Dr. Crass, but dialed the wrong number.  Apparently not realizing his mistake, Christiansen left a message on the answering machine, in which he stated that he had a gun and wanted to kill himself.  The person who received the message reported it to Dr. Crass' office.  However, no one from Dr. Crass' office responded to the call.  Someone from Dr. Crass' office did contact Christiansen at approximately 3:30 P.M. to confirm a future appointment.  Christiansen told the caller that he was going to kill himself.  When the caller offered Christiansen help, he declined.

Throughout the standoff, Christiansen was on the Internet viewing websites relating to negotiating with suicidal individuals.  Christiansen told Negotiator Butler on several occasions that Butler was not conducting himself properly.  Christiansen also continued drinking throughout the afternoon.  His speech became slurred; he was very emotional, and at times he cried.

---

[7] At one point, Butler told Christiansen:  "Sean, do you know why I want to wait until you come out to talk to her?  Do you know why?  Because I'm afraid if you talk to her now and say your goodbye that you'll kill yourself and I don't want you to kill yourself."

At approximately 5:00 P.M., TPD officers instructed Southwestern Bell to disconnect Christiansen's existing telephone number and assign a new telephone number. The TPD did this to prevent third parties from calling and interrupting negotiations and to keep Christiansen from going on the Internet to obtain information on suicide negotiations.

Late in the afternoon, Christiansen's speech became so slurred that Negotiator Butler had trouble understanding him. [8] The TPD officers also became concerned that Christiansen might pass out. Christiansen told Negotiator Butler, "I want to be dead. . . . I want to shoot myself, I'm serious. . . . It's a leave me alone situation. All I want to do is kill myself. Leave me alone." [9] A few moments later, Christiansen became angry with Butler and hung up the phone. The TPD officers reestablished phone contact with Christiansen, but he again hung up the phone.

The TPD officers concluded that Christiansen was no longer negotiating in good faith and decided that something had to be done to move the process along. At approximately 5:15 P.M., the TPD launched a "flexible baton," apparently

---

[8] Negotiator Butler was having trouble understanding Christiansen due to both his slurred speech and the fact that Christiansen was standing too far from the telephone speaker.

[9] Christiansen had made similar comments throughout the day. For example, at one point, Christiansen told Butler, "I'm not leaving this place until I'm . . . taken out on a gurney dead." Later in the day, he told Butler, "You'll hear a big blast here in about two minutes."

made of rubber, to breach a rear window in an unoccupied room on the east side of Christiansen's apartment. According to the TPD, they did so "in an attempt [to] encourage [Christiansen] to resolve the incident peacefully." Christiansen was on the phone with Negotiator Butler at the time the TPD launched the baton. Christiansen asked why the TPD had fired the baton, and Butler responded, "[we] want you to negotiate with [us] in good faith." [10] A few seconds later, Butler heard a single gunshot. Upon entering the apartment, the TPD officers found Christiansen lying on his back with a .38 caliber pistol at his hip and an apparently self-inflicted gunshot wound in his left temple. TPD officers also

---

[10] Specifically, the following conversation occurred:

Q [Negotiator Butler]: Sean?

A [Christiansen]: What?

Q:    What was that?

A:    You tell me.

Q:    Well, I think a tactical probably broke one of your windows.

A:    Why?

Q:    Because they want you to talk to me in good faith.

A:    Huh?

Q:    Because they want you to negotiate with me in good faith.

- 10 -

found a suicide note. Christiansen was immediately taken to a hospital by medical personnel. He died the following day.

Plaintiffs brought suit under 42 U.S.C. § 1983 on behalf of Christiansen and themselves, alleging violations of the Fifth and Fourteenth Amendments. The individual defendants moved for summary judgment, arguing that they were entitled to qualified immunity and that the evidence failed to establish that defendants violated plaintiffs' constitutional rights. The City of Tulsa also moved for summary judgment, arguing that plaintiffs' constitutional rights had not been violated.

In an order dated July 22, 2002, the district court granted defendants' respective motions for summary judgment, concluding that plaintiffs' allegations failed to establish a constitutional violation under the Fifth and Fourteenth Amendments. This appeal followed.

## II. Discussion

A.    Whether the District Court Correctly Concluded that Defendants' Conduct Did Not Violate the Fifth and Fourteenth Amendments.

1.    *Standard of review*

As to the individual defendants, we review de novo the district court's grant of summary judgment based on qualified immunity. *Warner v. Grand County*, 57 F.3d 962, 963 (10th Cir. 1995). In conducting our analysis, "[we] first

. . . determine whether the plaintiff has asserted a violation of a constitutional or statutory right, and then we decide whether that right was clearly established such that a reasonable person in the defendant's position would have known that [his] conduct violated that right." *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996) (citation omitted). Of course, we need not reach the question of whether the individual defendants are entitled to qualified immunity if we determine, after a de novo review, that plaintiffs failed to sufficiently allege the violation of a constitutional right. [11] *Lighton v. University of Utah*, 209 F.3d 1213, 1221 (10th Cir. 2000); *cf. Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1216 (10th Cir. 2003) ("In order to prevail on its 42 U.S.C. § 1983 claim, plaintiff must demonstrate that it suffered a deprivation of a federally protected right.").

As to the City, while the district court did not grant summary judgment to the City on the basis of qualified immunity, we also review de novo the district court's conclusion that no constitutional violation occurred. *Lighton*, 209 F.3d at 1221.

In this case, the district court concluded that defendants' conduct did not

---

[11] *Cf. Roska ex rel. Roska v. Peterson*, __ F.3d __, 2003 WL 1963209, (10th Cir. Apr. 29, 2003) ("Order is important; we must decide first whether the plaintiff has alleged a constitutional violation, and only then do we proceed to determine whether the law was clearly established.") (citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001)).

rise to the level of a substantive due process violation under the Fifth and Fourteenth Amendments. [12] For the reasons set forth below, we agree.

> 2. *Whether defendants violated the Fifth and Fourteenth Amendments through the use of excessive force.*

Under the Due Process Clause, [13] we focus on three factors in considering claims of excessive force: "'(1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the . . . officer.'" *Bella v. Chamberlain*, 24 F.3d 1251, 1257 (10th Cir. 1994) (quoting *Hannula v. City of Lakewood*, 907 F.2d 129, 131-32 (10th Cir. 1990)). "Force inspired by malice or by 'unwise, excessive zeal amounting to an abuse of official power that shocks the conscience . . . may be redressed under [the Fifth Amendment].'" *Id.* (quoting *Hewitt v. City of Truth or Consequences*, 758 F.2d 1375, 1379 (10th Cir. 1985)).

---

[12] Although the district court concluded that Dr. Gentz was entitled to raise the qualified-immunity defense, we find it unnecessary to reach this question. Rather, we affirm based on plaintiffs' failure to allege facts sufficient to give rise to a constitutional violation under the Fifth and Fourteenth Amendments. *See Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1216 (10th Cir. 2003) ("In order to prevail on its 42 U.S.C. § 1983 claim, plaintiff must demonstrate that it suffered a deprivation of a federally protected right."). In addition, we do not review the district court's conclusion that Dr. Gentz was acting "under the color of state law," since Dr. Gentz does not challenge that conclusion on appeal.

[13] Plaintiffs have not advanced any claims of excessive force under the Fourth Amendment.

In this case, plaintiffs allege that defendants' conduct, specifically the act of firing the flexible baton into Christiansen's apartment, constituted excessive force. We disagree for several reasons.

First, the TPD launched the flexible baton, which was made of rubber, into the rear window of an unoccupied room in Christiansen's apartment. Christiansen suffered no physical injuries as a direct result of the defendants' actions, and, as we noted in *Bella*, "we have never upheld an excessive force claim without some evidence of physical injury." [14] 24 F.3d at 1257-58 (comparing cases). Second, Christiansen's complaint makes no allegations of improper motives or malice. *Cf. id.* at 1258. Throughout the standoff, the TPD officers demonstrated concern for Christiansen's physical well-being; and, although the TPD officers became frustrated with Christiansen's refusal to negotiate, at no point did the TPD officers act for any purpose other than to protect Christiansen's physical safety. Finally, the amount of force used in this case was not "grossly disproportionate" to the need presented. *See Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir. 1981). The TPD officers did not employ "deadly" force; in fact, because Christiansen was not in the room, there was virtually no likelihood of physical harm directly

---

[14] To the extent plaintiffs argue that the TPD's actions precipitated Christiansen's infliction of the gunshot wound, plaintiffs must proceed under the "special relationship" doctrine or the "state created danger" doctrine, *cf. Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253 (10th Cir. 1998), which we consider in section II.A.2.a, *infra*.

resulting from the firing of the baton. Further, the TPD officers fired the baton in order to prompt Christiansen to continue negotiations. At most, the TPD officer's actions constituted a trespass and "a trespass to property, negligent or intentional, is a common law tort; it does not infringe the federal constitution." *Id*. at 1335.

Accordingly, we hold that defendants did not employ excessive force against Christiansen in violation of the Fifth and Fourteenth Amendments.

> a. *Whether defendants violated the Fifth and Fourteenth Amendments under the "special relationship" doctrine or the "state-created danger" doctrine.*

Normally, "state actors are liable only for their own acts, and not the violent acts of third parties." *Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253, 1260 (10th Cir. 1998). Thus, "[a]s a general matter, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). Although "[the Due Process Clause] forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' . . . its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* at 195.

As we noted in *Armijo*, however, there are two exceptions to this general

rule:

> The first exception, known as the special relationship doctrine, "exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual. . . ." The second exception, sometimes referred to as the "danger creation" theory, provides that a state may also be liable for an individual's safety "if it created the danger that harmed the individual."

159 F.3d at 1260 (quoting *Liebson v. New Mexico Corrections Dep't*, 73 F.3d 274, 276 (10th Cir.1996)).

Plaintiffs here, in arguing that defendants violated Christiansen's Fifth and Fourteenth Amendment rights, contend that both exceptions apply. We consider each in turn.

(1)    Special relationship

"[I]f the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty, the state may thereby enter into a 'special relationship' during such restraint to protect that individual from violent acts inflicted by others." *Armijo*, 159 F.3d at 1261. Absent involuntary restraint, however, no duty to protect arises under the special-relationship theory. *Id.* "'The affirmative duty to protect arises not from the State's knowledge of the individual's predicament . . . but from the limitation which it has imposed on his freedom to act on his own behalf.'" *Id.* (quoting *DeShaney*, 489 U.S. at 200).

- 16 -

In this case, plaintiffs argue that the TPD's quarantine "limited Christiansen's freedom to act, particularly his freedom to renew his request for medical assistance." We disagree.

First, we note that Christiansen had access to a telephone line for essentially the entire duration of the standoff.[15] At no point did Christiansen reach out for medical assistance; in fact, he did not respond to the TPD's offers to contact Dr. Crass, and he specifically turned down their repeated offers of medical treatment.

Second, rather than restraining Christiansen, the TPD officers affirmatively encouraged Christiansen to leave his apartment throughout the standoff. Although the TPD officers would not provide Christiansen with cigarettes or allow him to speak to his mother while in the apartment, Negotiator Butler specifically told Christiansen that he could have cigarettes and speak to his

---

[15] We acknowledge that Christiansen was without a phone line for a brief interval, apparently less than fifteen minutes, while Southwestern Bell disconnected the old line and installed a new line. The TPD requested that Southwestern Bell disconnect Christiansen's old line in order to avoid third-party contacts that might frustrate the negotiation effort. Plaintiffs' contention notwithstanding, the TPD officers' actions in changing Christiansen's phone number did not limit Christiansen's freedom to act on his own behalf, as he could still make outgoing calls from the phone line once the installation was completed. In other words, although the number change perhaps restrained third-party action, it did not limit Christiansen's freedom to act on his own behalf. The "special relationship" theory is therefore inapposite. To the extent this distinction foreshadows plaintiffs' argument under the "state created danger" doctrine, we consider it in more detail in section II.A.2.a(2), *infra*.

mother if he complied with their request to peaceably leave the building. [16]

Further, Butler assured Christiansen that no one wanted to hurt him and advised him numerous times that if he came out peaceably, the TPD officers would provide him with medical treatment.

Based on the above, we conclude that the TPD's quarantine neither involuntarily restrained Christiansen nor limited his freedom to act on his own behalf. Thus, no special relationship or attendant affirmative duty to protect Christiansen arose under *Armijo* and *Uhlrig*.

(2)    Danger creation

"[W]e have held that state officials can be liable for the acts of third parties where those officials 'created the danger' that caused the harm." *Seamons v. Snow*, 84 F.3d 1226, 1236 (10th Cir. 1996). In considering danger-creation claims, we have articulated the following six-part test:

> To make out a proper danger creation claim, a plaintiff must demonstrate that (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate

---

[16] We also note that the TPD's justifications for these actions were manifestly reasonable. Christiansen informed Negotiator Butler that he desired one last cigarette before he died and that he wished to see his mother so that he could explain his reasons for taking his own life. Thus, Negotiator Butler reasonably concluded that prohibiting Christiansen from having a cigarette or speaking to his mother would likely delay or prevent a suicide attempt.

harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Gonzales v. City of Castle Rock*, 307 F.3d 1258, 1263 (10th Cir. 2002).

In considering the required scienter, we have focused on the deliberateness of the conduct at issue. The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." *Uhlrig*, 64 F.3d at 573. Thus, section 1983 liability will not lie absent (1) "an intent to harm" or (2) "an intent to place a person unreasonably at risk of harm." *Id.* (footnote omitted). We have previously noted that the latter requires that "the defendant recognize[] the unreasonable risk and *actually intend* [] to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Id.* at 573 n.8 (emphasis added).

In this case, the "danger" in question – Christiansen's exposure to a suicide attempt – existed prior to defendants' intervention. Thus, defendants cannot be liable under section 1983 for having "created" Christiansen's predicament. Plaintiffs argue, however, that the TPD's actions – specifically the quarantine, which restrained third-party contacts with Christiansen, and the firing of the flexible baton – "increased [Christiansen's] vulnerability to the danger in some way," *Armijo*, 159 F.3d at 1263, sufficient to support liability under section 1983 and the Due Process Clause. For several reasons, we disagree.

- 19 -

First, regarding both the quarantine and the use of the flexible baton, plaintiffs do not argue that defendants "inten[ded] to place [Christiansen] unreasonably at risk of harm." *See Uhlrig*, 64 F.3d at 573 (footnote omitted). To the contrary, as defendants' actions throughout the day demonstrated, they intended to remove Christiansen from the dangerous situation that he himself had created. Even if the defendants acted negligently in employing the flexible baton, the Due Process Clause protects against "*deliberately* wrongful government decisions rather than merely negligent government conduct." *Id.* (emphasis added).

Second, far from shocking the conscience, the defendants' actions in not allowing Christiansen's mother or wife to enter the apartment were appropriate. *Cf. Andrews v. Wilkins*, 934 F.2d 1267, 1271 (D.C. Cir. 1991) (concluding that "police were entitled, if not obliged, to prevent [a third party] from endangering her life [by attempting to aid] in the course of a police rescue effort"). Rather than "cutting off potential sources of private aid," *Armijo*, 159 F.3d at 1263, defendants sought to protect Christiansen's mother and wife while avoiding the possibility of precipitating a violent reaction from Christiansen. Christiansen was heavily armed and had specifically threatened his wife earlier in the day. Further, Christiansen had threatened to shoot *anyone* who tried to enter the apartment and had repeatedly threatened to kill himself if anyone attempted to enter the

apartment. Finally, Christiansen had told Negotiator Butler that he wished to see his mother so that he might explain his reasons for committing suicide. Thus, by not allowing Christiansen this opportunity, defendants likely forestalled Christiansen's suicide attempt rather than hastening it.

Finally, although defendants' actions in setting up the quarantine, including their instruction to Dr. Crass not to contact Christiansen and their eventual disconnection of Christiansen's phone line, [17] may have potentially preempted an attempt by Dr. Crass to provide assistance to Christiansen, nothing in the record indicates that Dr. Crass actually insisted on speaking to Christiansen. [18] Although Dr. Crass offered to assist the TPD and requested to speak with Christiansen, he never stated that – based upon his relationship with Christiansen – he considered his personal intervention necessary to protect Christiansen. Further, twice during

---

[17] Significantly, Christiansen's phone number was not changed until late in the standoff, at approximately 5:00 P.M. Further, we note that, before the district court, plaintiffs' counsel apparently conceded that Christiansen was not denied access to Dr. Crass.

[18] Although Dr. Gentz instructed Dr. Crass not to contact Christiansen, he did so in order to avoid frustrating the negotiation efforts. In addition, Dr. Crass later stated that he "knew . . . [Christiansen] had access to a telephone," and that "Gentz' statement that [Christiansen] had no telephone was probably intended to prevent me from trying to contact [Christiansen]." Further, Dr. Crass was aware that his office had contacted Christiansen at 3:30 P.M., which suggests that Christiansen had access to a phone, specifically, the phone number that Dr. Crass' office had on record. Finally, in his notes taken shortly after the incident, Dr. Crass wrote: "Sean did have access to a telephone. I do not know if he had another phone, if he could dial out via the base unit, or if Dr. [Gentz] was simply lying to me to keep me from calling him."

the standoff, Negotiator Butler asked Christiansen whether he wanted to speak with Dr. Crass, and Christiansen did not respond. In addition, Christiansen did have telephone contact with Dr. Crass' office; and, during that conversation, Christiansen specifically declined the caller's offer of help. Finally, insofar as third-party contacts could have frustrated the TPD's negotiation effort, defendants had some justification for their actions.

As we noted in *Uhlrig*, "[t]he Due Process Clause 'is not a guarantee against incorrect or ill-advised [government] decisions,'" 64 F.3d at 573 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)), and defendants' conduct did not "demonstrate a degree of outrageousness . . . that is truly conscience shocking," *id.* at 574. Accordingly, we conclude that the district court properly held that plaintiffs' allegations were insufficient to support a finding of a violation of Christiansen's Fifth and Fourteenth Amendment rights.

> b. *Whether defendants violated the Fifth and Fourteenth Amendment rights of Christiansen's survivors, Theresa Christiansen and Meagan Thompson.*

Plaintiffs' complaint also alleged that defendants' conduct violated their individual rights under the Fifth and Fourteenth Amendments. The district court concluded that plaintiffs failed to state a claim. We agree.

Under *Trujillo v. Bd. of County Comm'rs*, an "allegation of intent to

interfere with a particular relationship protected by the freedom of intimate association is required to state a claim under section 1983." 768 F.2d 1186, 1190 (10th Cir. 1985). Plaintiffs made no such allegation. Further, any claim of excessive use of force is wholly without merit. Defendants' actions in restraining Theresa Christiansen and Meagan Thompson from entering the apartment after hearing the gunshot were manifestly reasonable. *Cf. Andrews*, 934 F.2d at 1271 (concluding that "police were entitled, if not obliged, to prevent [a third party] from endangering her life [by attempting to aid] in the course of a police rescue effort"). Thus, plaintiffs' allegations fail to establish a constitutional violation of their own rights under the Fifth and Fourteenth Amendments.

B.      Whether the District Court Erred in Excluding Dr. Crass' Affidavit.

We review a district court's ruling on the admissibility of evidence for an abuse of discretion. *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1246 (10th Cir. 2000). "We must afford great deference to the district court; review of a cold record is a poor substitute for a trial judge's intimate familiarity with the evidence and its role in the context of the trial as a whole." *Id.*

In his affidavit, Dr. Crass stated, *inter alia*,[19] the following:

[1] By Gentz dissuading me from making contact with [Christiansen], it became more likely that [Christiansen] would not obtain medical

---

[19] To the extent the remainder of Dr. Crass' affidavit contained admissible statements, it would not change the result in this case.

advice and treatment during the standoff.

[2] Gentz's interferences of [sic] my contact with [Christiansen] increased the likelihood that [Christiansen] would attempt to harm or kill himself.

[3] In my professional opinion, cutting off [Christiansen] from his doctor and his mother was reckless.

[4] It is my professional opinion that Sean Christiansen could probably have been helped by me or by Sean's mother because his suicidal ideation was an issue which I had handled and addressed with [him] and which his mother had handled and addressed with him. [20]

"Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998). Whether defendants in this case acted "recklessly" is a legal conclusion, and thus, the district court properly excluded that portion of Dr. Crass' affidavit. Further, "[i]t is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate." *Goebel v. Denver & Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000). Dr. Crass' statements regarding what might have happened had he been allowed to intervene are pure speculation. Further, as we noted earlier, during the standoff, the TPD asked Christiansen whether he wanted

---

[20] According to Dr. Gentz' notes, taken contemporaneously with his initial conversation with Dr. Crass, Dr. Crass was not aware of any previous suicide threats by Christiansen.

- 24 -

to see Dr. Crass, and Christiansen never responded to these inquiries. Finally, insofar as Dr. Crass did not convey this information to defendants at the time of the events in question, it has little, if any, probative value. Accordingly, the district court did not abuse its discretion in excluding Dr. Crass' affidavit.

## III. Conclusion

Based on the foregoing, we AFFIRM the district court's grant of defendants' respective motions for summary judgment.