FILED
United States Court of Appeals
Tenth Circuit

May 29, 2015

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

SIERRA CLUB, INC., CLEAN
ENERGY FUTURE OKLAHOMA,
EAST TEXAS SUB REGIONAL
PLANNING COMMISSION,

        Plaintiffs - Appellants,

v.

LIEUTENANT GENERAL
THOMAS P. BOSTICK, in his
official capacity as Commanding
General and Chief of Engineers of
the U.S. Army Corps of
Engineers; MAJOR GENERAL
MICHAEL J. WALSH, in his
official capacity as U.S. Army
Commanding General for Civil
and Emergency Operations;
COLONEL RICHARD PRATT, in
his official capacity as Tulsa
District Commander of U.S. Army
Corps of Engineers; COLONEL
RICHARD PARNELL, in his
official capacity as Galveston
District Engineer of the U.S.
Army Corps of Engineers;[1*]
UNITED STATES ARMY CORPS
OF ENGINEERS,

        Defendants - Appellees,

No. 14-6099

---

[*] Pursuant to Fed. R. App. P. 43(c)(2) Colonel Pratt is substituted for
Colonel Teague and Colonel Parnell is substituted for Colonel Sallesse.

and

TRANSCANADA KEYSTONE
PIPELINE LP, a Deleware limited
partnership; TRANSCANADA
CORPORATION, a Canadian public
company; INTERSTATE
NATURAL GAS ASSOCIATION,
AMERICAN GAS ASSOCIATION,
ASSOCIATION OF OIL PIPE
LINES, AMERICAN PETROLEUM
INSTITUTE, UTILITY WATER
ACT GROUP,

Intervenors - Appellees.

Douglas P. Hayes, Sierra Club, Boulder, Colorado (Eric E. Huber, Sierra Club, Boulder, Colorado, with him on the briefs), for Appellants.

David C. Shilton, U.S. Department of Justice, Washington, D.C. (Sam Hirsch, Acting Assistant Attorney General, Michele Walter, Maureen E. Rudolph, and Ty Bair, U.S. Department of Justice, Washington, D.C.; and Ann P. Navaro, Assistant Chief Counsel and Milton S. Boyd, Assistant Counsel, U.S. Army Corps of Engineers, with him on the brief), for Appellees.

Peter R. Steenland, Sidley Austin LLP, Washington, D.C. (Lauren C. Freeman, Lisa E. Jones, Sidley Austin LLP, Washington, D.C.; and Deidre G. Duncan, Andrew J. Turner, and Karma B. Brown, Hunton & Williams LLP, Washington, D.C., with him on the brief), for Intervenors-Appellees.

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:12-cv-00742-R)**

Before **BACHARACH**, Circuit Judge, **BALDOCK**, Senior Circuit Judge, and **McHUGH**, Circuit Judge.

**BACHARACH**, Circuit Judge.

This case involves the authority of the U.S. Army Corps of Engineers to issue nationwide permits under § 404(e) of the Clean Water Act. These permits authorize activities involving discharge of dredged or fill material in U.S. waters and wetlands. *See* 33 U.S.C. § 1344(e) (2012). Exercising this permitting authority, the Corps issued Nationwide Permit 12, which allows anyone to construct utility lines in U.S. waters "provided the activity does not result in the loss of greater than ½ acre of [U.S. waters] for each single and complete project." Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, 10,271 (Feb. 21, 2012).[2]

TransCanada Corporation proposed to rely on the nationwide permit to build an oil pipeline, the Gulf Coast Pipeline,[3] which would run approximately 485 miles and cross over 2,000 waterways. The Corps issued letters verifying that Nationwide Permit 12 would cover the proposed

---

[2]    The Corps has defined the term "single and complete project" to mean "the total project proposed or accomplished by one owner/developer or partnership or other association of owners/developers." 33 C.F.R. § 330.2(i) (2012). For linear projects like utility lines, the Corps considers each crossing of a waterway to be a "single and complete project" as long as these crossings are "separate and distant." *Id.*

[3]    The Gulf Coast Pipeline is the southern segment of a larger pipeline project called the "Keystone XL Pipeline."

construction. Shortly thereafter, TransCanada began constructing the pipeline, which has since been completed and is currently transporting oil.

Three environmental groups (Sierra Club, Inc.; Clean Energy Future Oklahoma; and East Texas Sub Regional Planning Commission) have challenged the validity of the nationwide permit and verification letters. The district court rejected these challenges and entered judgment for the defendants.

In this appeal, we address and reject three sets of claims:

- *Claims Involving the National Environmental Policy Act (NEPA)*: The environmental groups argue that the Corps violated NEPA by issuing the nationwide permit without considering the risk of oil spills and the cumulative environmental impacts of pipelines. These arguments are waived.

  The environmental groups also argue that the Corps issued the verification letters without conducting a NEPA analysis. We conclude that this analysis was not necessary at the verification stage.

- *Claims Involving the Clean Water Act*: According to the environmental groups, the nationwide permit violates the Clean Water Act by (1) effectively authorizing activities with more-than-minimal environmental impacts and (2) unlawfully deferring a portion of the minimal-impacts analysis to project-level personnel. We reject both arguments. The environmental groups have not shown that the permit authorizes activities with more-than-minimal impacts, and the Corps has permissibly interpreted the statute to allow partial deferral of its minimal-impacts analysis.

- *Claims Involving the Nationwide Permit 12*: Finally, the environmental groups contend that the Corps incorrectly verified compliance with the nationwide permit without analyzing the cumulative effects or documenting the analysis of

4

cumulative effects. We reject this contention. Corps officials did not need to include a cumulative-effects analysis in the letters, and the record shows that officials conducted the necessary analysis.

Based on our conclusions, we affirm the entry of judgment in favor of the defendants.[4]

## I.      Standard of Review

We review the challenges under the Administrative Procedure Act (APA). *See* 5 U.S.C. §§ 701-706 (2012). In applying this standard, we will set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2012).

Review under the APA is narrow: "[T]he agency need only demonstrate that it considered relevant factors and alternatives . . . and that the choice it made was reasonable based on that consideration." *Mt. Evans Co. v. Madigan*, 14 F.3d 1444, 1453 (10th Cir. 1994).

---

[4]      The intervenors have raised prudential mootness. Prudential mootness concerns a court's discretion, not its power, to grant relief. *S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997). We elect not to address prudential mootness, as we conclude the claims fail on other grounds. *See Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1167 (10th Cir. 2012) ("As for prudential mootness, it is within the court's discretion to decline to address an issue on prudential mootness grounds.").

5

## II.    NEPA

The environmental groups make two arguments to challenge the district court's disposition of the NEPA claims:

1.    The Corps' environmental analysis is deficient because the agency failed to consider the risk of oil spills and the cumulative impacts of pipelines.

2.    The Corps failed to conduct an environmental analysis when verifying that the pipeline was permissible under the nationwide permit.

We reject both arguments. The environmental groups waived their claims involving failure to address oil spills and cumulative impacts, and the Corps was not required to conduct an environmental analysis when verifying compliance with the nationwide permit.

### A.    Requirements of NEPA

NEPA requires an agency to take a "hard look" at the environmental impacts of proposed actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). In taking this "hard look," the agency must take appropriate steps: If the venture involves a "major Federal action" that would "significantly affect[] the quality of the human environment," the agency must prepare a detailed environmental impact statement. 42 U.S.C. § 4332(2)(C) (2012). But if the future effects are unclear, the agency can prepare an environmental assessment instead of a more detailed environmental impact statement. *Dep't of Transp. v. Pub. Citizen*, 541 U.S.

6

752, 757 (2004). If the environmental assessment shows that the impact would be insignificant, the agency need not provide any further environmental report.[5] *Id.* at 757-58.

## B. Issuance of Nationwide Permit 12

The Corps prepared an environmental assessment of activities permitted under Nationwide Permit 12, which is challenged by the environmental groups. They contend the Corps unlawfully failed to consider

- the risk of oil spills associated with pipelines and

- the cumulative impacts of pipelines.

We conclude that these challenges are waived.

## 1. Waiver: The General Rule and the Pertinent Exceptions

Parties challenging an agency's compliance with NEPA must ordinarily raise relevant objections during the public comment period. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764-65 (2004). But two exceptions exist. First, commenters need not point out an environmental assessment's flaw if it is "obvious." *Id.* at 765. Second, a commenter does not waive an issue if it is otherwise brought to the agency's attention. *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1170 (10th Cir. 2007).

---

[5]    Instead, the agency is to make a "finding of no significant impact." *Pub. Citizen*, 541 U.S. at 757-58.

## 2.     Risk of Oil Spills

The environmental groups concede that no commenter raised the oil-spill issue. *See* Appellants' Reply Brief at 11. Nonetheless, the environmental groups contend that the issue is not waived because

- the risk of oil spills is obvious, and

- the Corps knew about the risk of oil spills when issuing the nationwide permit.

We reject both of these contentions.[6] The environmental groups have not shown an obvious deficiency in the Corps' environmental assessment, and the Corps' knowledge of oil-spill risks does not relate to a deficiency in the Corps' assessment for the construction, maintenance, and repair of utility lines.

### a.     Obviousness

The environmental groups assert that the oil-spill issue is not waived because the risk of oil spills is obvious. We reject this contention.

---

[6]     The environmental groups also state that until this project, installation of all major oil pipelines had undergone a project-level NEPA review. Based on this statement, the environmental groups say that they (1) did not perceive a need to make comments when the Corps considered the nationwide permit, and (2) should not be penalized for raising the issue in connection with the Keystone XL Pipeline proceedings rather than as an objection to Nationwide Permit 12. For the sake of argument, we can assume the environmental groups are correct. They appear to imply that they should not be subjected to the ordinary rules of exhaustion, requiring comment to the Corps as it was considering whether to issue the nationwide permit. But the environmental groups have not provided authority or analysis that would justify an exception to the ordinary rules of exhaustion based on the alleged change in practice.

To qualify for this exception, the environmental groups must show that the omission of any discussion of oil-spill risks entailed an obvious flaw in the environmental assessment. The environmental groups argue that the risk of oil spills is obvious. But that is not the groups' burden. The environmental groups must show that the assessment for the construction, maintenance and repair of utility lines contained an obvious flaw, not that the agency failed to discuss impacts of an obvious risk associated with certain activity. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765 (2004) (stating that "an [environmental assessment's] . . . flaws might be so obvious that there is no need for a commenter to point them out"). The fact that pipelines create a risk of spillage does not mean that the alleged deficiency in the Corps' environmental assessment for the construction, maintenance, and repair of utility lines would have been obvious.

Nationwide Permit 12 authorized the discharge of dredged or fill material in the construction, maintenance, and repair of a wide variety of utility lines, including lines to transmit gas, cable, electricity, telephone calls, radio transmissions, sewage, and oil. Appellants' App. at 488-89; Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, at 10,271-72 (Feb. 21, 2012). In light of the variety of utility lines involved, the Corps focused on the actions that it authorized (discharge of dredged and fill material in the construction, maintenance, and repair of utility lines) rather than the eventual operation of the utility lines. *See* Appellants' App. at 528

(assessing the environmental consequences of the activities authorized by Nationwide Permit 12). Once the utility lines were completed, each utility would seek approval from the pertinent regulatory body with jurisdiction over operations. For example, TransCanada would need to seek and obtain authorization from the Pipeline and Hazardous Materials Safety Administration, which had jurisdiction over the operation of oil pipelines. *See* 49 C.F.R. §§ 195.401-402 (2012) (stating the requirements for operation of pipelines). Upon construction of the pipeline, TransCanada could not transport oil until it complied with the Pipeline and Hazardous Materials Safety Administration's requirements addressing the risk of oil spills. 49 C.F.R. § 194.7 (2012).

The environmental groups argue that the Corps' environmental assessment should have been broader, examining the risks from the utility lines' operations as well as their construction. But this criticism relates to the merits of the NEPA claim rather than the obviousness of the alleged deficiency to the Corps.[7] The Corps set out to consider all categories of environmental risks from the activities authorized under Nationwide Permit 12 (as well as the cumulative impacts of other activities affecting the

---

[7] The environmental groups argue that some other courts require the Corps to consider the risk of oil spills. *See Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005); *Sierra Club v. Sigler*, 695 F.2d 957, 962 (5th Cir. 1983). This argument relates to the merits rather than exhaustion. Because the oil-spill claim is unexhausted, we do not reach the merits.

nation's aquatic resources). Appellants' App. at 528, 530. In considering these categories of environmental risks, the Corps distinguished between the activities that it authorized under the nationwide permit (construction, maintenance, and repair of utility lines) and the utility lines' future operations. If that view was too restrictive, the deficiency would not have been obvious to the Corps, for TransCanada could not begin operations until it submitted a suitable plan to the Pipeline and Hazardous Materials Safety Administration to address the risk of oil spills. 49 C.F.R. § 194.7 (2012).

The environmental groups argue that the risk of oil spills would have been obvious to the Corps because of comments submitted to agencies concerning the proposed Keystone XL project. But these comments would have led the Corps to believe that the risk of oil spills fell within the domain of other agencies, for all of the comments about oil spills had been directed to the Pipeline and Hazardous Materials Safety Administration (rather than the Corps). *See* Appellants' App. at 1180-92. In these comments, no one questioned the Corps' focus on environmental risks from the activities authorized under the nationwide permits (rather than the environmental risks from future operations).

Because the Corps ordinarily confined its environmental assessments to impacts from the activities authorized under the nationwide permit (construction, maintenance, and repair of utility lines), rather than the

11

eventual operation of these utility lines, the risk of oil spills would not have alerted the Corps to an obvious deficiency in its environmental assessment.

### b. Independent Knowledge of the Risk/Otherwise Brought to the Corps' Attention

The environmental groups also assert the oil-spill issue is not waived because the Corps knew about spill risks when issuing the nationwide permit. We reject this argument. Even if the Corps knew about spill risks, this knowledge would not have prevented a waiver.

We have recognized an exception to waiver when an issue is brought to the agency's attention. *See* p. 7, above. The Ninth Circuit Court of Appeals has equated this exception and the obviousness exception. *See Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011) ("This court has interpreted the 'so obvious' standard as requiring that the agency have independent knowledge of the issues that concern petitioners."). We need not decide whether to adopt the Ninth Circuit's view, as we have elsewhere concluded that the risk of oil spills would not have created an obvious deficiency in the Corps' environmental analysis of the construction, maintenance, and repair of utility lines.

Even if we were to adopt the Ninth Circuit's approach, its application here would make little sense. The Corps' "independent knowledge" would be based on its role as a cooperating agency in the State Department's

12

environmental impact statement for the Keystone XL Pipeline. This environmental impact statement contained ample discussion of environmental risks involving oil spills. But the environmental impact statement addressed these risks as the domain of a separate agency: the Pipeline and Hazardous Materials Safety Administration. *See* Appellants' App. at 1990 ("[Pipeline and Hazardous Materials Safety Administration] is responsible for regulations that require safe operations of hazardous liquid pipelines to protect human health and the environment from unplanned pipeline incidents."). None of the commenters suggested that the Corps had any responsibility to address the risk of oil spills.

We may assume, for the sake of argument, that the Corps knew that issuance of the nationwide permit could lead to installation of oil pipelines, which in turn could create environmental risks from oil spills. How would that knowledge have mattered to the Corps? It considered that risk to fall within another agency's responsibility. Regardless of whether that view was correct, it went unchallenged in the public comments for the issuance of Nationwide Permit 12 and the State Department's consideration of the Keystone XL Pipeline. Thus, there would have been little reason for the Corps to consider oil spills in its environmental assessment.

In these circumstances, the Corps' alleged knowledge about oil spills would not have avoided a waiver.

### 3.    Cumulative Impacts

The environmental groups also argue the Corps violated NEPA by failing to consider the cumulative impacts of oil pipelines. This argument is also waived, as no commenter objected to the Corps' assessment on this ground.

As discussed, parties challenging an agency's compliance with NEPA must raise relevant objections during the comment period. *See* p. 7, above. These objections must specifically raise the issue presented on appeal; if the objections do not raise the issue, it is waived. *See Ariz. Pub. Serv. Co. v. E.P.A.*, 562 F.3d 1116, 1127 (10th Cir. 2009) (stating that the appellant could not "rely on general or vague commentary . . . to avoid the established principles of waiver" (citing *Appalachian Power Co. v. E.P.A.*, 251 F.3d 1026, 1036 (D.C. Cir. 2001))).

Some commenters mentioned cumulative impacts in other contexts, such as aquatic areas. But no one discussed a need for the Corps to consider the cumulative impacts on dry-land areas.

For example, some commenters objected to the use of multiple permits for multiple water crossings associated with one linear project. *See* Appellants' App. at 480-81. In the view of these commenters, the use of multiple permits might "prevent the Corps from assessing the [overall] cumulative effects" of one linear project. *Id.* at 481. Another commenter requested that the Corps apply the half-acre limit to entire linear projects

14

(rather than each water crossing) to ensure the Corps assessed "cumulative effects" of the entire project. *Id.* at 413.

Though these comments used variations of the phrase "cumulative impact," the commenters were focusing on the cumulative impact on aquatic areas—not dry-land areas. As a result, this objection was waived. *See Ariz. Pub. Serv. Co. v. E.P.A.*, 562 F.3d 1116, 1127 (10th Cir. 2009) (holding that a party could not challenge the rationality of an agency rule because no party had specifically attacked the rule's rationality during the comment period).[8]

## 4. Summary

Accordingly, we conclude that the environmental groups have waived their claims that the Corps violated NEPA by failing to consider oil-spill risks and cumulative impacts of pipelines.

## C. Verification Under the Nationwide Permit

The environmental groups also argue the Corps should have prepared a NEPA analysis for the entire Gulf Coast Pipeline before issuing the verification letters. We disagree. The verifications do not constitute "major

---

[8] In her thoughtful concurrence, Judge McHugh concludes that it would have been obvious to the Corps that its analysis of cumulative effects was too restrictive. In our view, however, the environmental groups did not invoke the obviousness exception on the NEPA claims involving cumulative effects. *See* Appellants' Opening Br. at 33-34; Appellants' Reply Br. at 14-16. Instead, we believe the obviousness exception was raised solely on the NEPA claims involving oil spills. *See* Appellants' Opening Br. at 25-26; Appellants' Reply Br. at 11, 14.

Federal action" warranting NEPA review, and the agency was not required to assess impacts of the entire pipeline.

### 1. Major Federal Action

NEPA requires agencies to evaluate the impacts of all "major Federal actions." 42 U.S.C. § 4332(2)(C) (2012); *Ross v. Fed. Highway Admin.*, 162 F.3d 1046, 1051 (10th Cir. 1998). For the sake of argument, we can assume that the verifications constitute "federal actions." But issuance of a verification letter would create a "major Federal action" only if it resulted in significant impact,[9] and the verification letters would not result in significant impact.

The environmental groups contend that the verifications constitute "major Federal action" because they were essential for the pipeline's completion. The premise of the contention is neither self-evident nor supported by authority.

Without the ability to rely on Nationwide Permit 12 to discharge dredged and fill material, TransCanada might have been able to obtain an individual or regional permit[10] or routed the pipeline to avoid many of the

---

[9]     *See* 40 C.F.R. § 1508.18 (2012).

[10]     *See* 33 C.F.R § 330.1(d) (2012) (stating that Corps officials may instruct permittees whose projects do not qualify for nationwide permits to "apply for a regional general permit or an individual permit").

16

waterway crossings. Thus, TransCanada might have been able to complete the pipeline without the verifications.

The environmental groups rely on two district court cases: *Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1242 (Dist. Wyo. 2005), and *Spiller v. Walker*, No. A-98-CA-255-SS, 1998 U.S. Dist. LEXIS 18341, at *39-41 (W.D. Tex. Aug. 25, 1998). Reliance on these cases is misplaced.

In *Wyo. Outdoor Council*, the court stated that the Corps is the "gatekeeper for approval" of projects and, as the gatekeeper, it should consider environmental impacts of those projects. *Wyo. Outdoor Council*, 351 F. Supp. 2d at 1242. But the court was describing the Corps' duty when it issues a regional permit,[11] not when it issues verifications.

In *Spiller*, the court stated in dicta that the Corps would commit "major Federal action" by granting an easement and dredge-and-fill permit for a proposed pipeline. *Spiller*, 1998 U.S. Dist. LEXIS 18341, at *43-44. But as the statement indicates, the Corps had not yet issued a permit. Thus, the district court's statement had no effect on the outcome.

These decisions do not persuade us to expand the Corps' NEPA obligations, for the Corps neither acted as a "gatekeeper" nor approved the

---

[11] Regional permits are authorized under the same section of the Clean Water Act as nationwide permits. *See* 33 U.S.C. § 1344(e) (2012). But regional permits authorize activities in specific regions instead of the entire country. 33 C.F.R. § 330.2(b) (2012).

pipeline; the Corps simply verified that TransCanada's project was covered by Nationwide Permit 12.

At that point, there was little reason for a new NEPA review because the Corps had already conducted a NEPA analysis when issuing Nationwide Permit 12. As long as the proposed activities were authorized by the nationwide permit, the Corps would have had little reason to conduct a second NEPA review when issuing the verification letters.

A similar issue arose in *Snoqualmie Valley Pres. Alliance v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155 (9th Cir. 2012) (per curiam). There a utility planned to lower a dam to mitigate flooding problems. *Snoqualmie Valley*, 683 F.3d at 1157. Before carrying out this plan, the utility asked the Corps to verify that lowering of the dam would be covered by two existing nationwide permits. *Id.* at 1158. Downstream property owners objected, arguing that the Corps violated NEPA by allowing the utility to proceed under the nationwide permits. *Id.* at 1164. The Ninth Circuit Court of Appeals rejected the argument, explaining that the Corps must comply with NEPA when promulgating the nationwide permits—not when someone seeks to act under the permit. *Id.* at 1164.

The court's explanation is persuasive and equally applicable here. The Corps complied with NEPA when it issued Nationwide Permit 12 for the construction, maintenance, and repair of a wide variety of utility lines. Though the Corps did not issue an environmental impact statement, it did

issue an environmental assessment and ultimately concluded that the environmental impact would be insignificant. When the Corps verified that TransCanada could proceed under the nationwide permit, the Corps was simply saying that the permit applied; the Corps was not authorizing anything that it had not already authorized when issuing the permit. *See Riverside Irrigation Dist. v. Andrews*, 758 F.2d 508, 511 (10th Cir. 1985) (stating that nationwide permits are "automatic in that if one qualifies, no application is needed before beginning the discharge activity").

The environmental groups argue that *Snoqualmie* is distinguishable in two ways:

1.  There the court addressed a single location, and here the pipeline went through thousands of water crossings.

2.  There another agency (FERC) conducted a NEPA analysis of the project (lowering of the dam), but here no one ever assessed the impact of the project (operation of an oil pipeline).

Appellants' Opening Br. at 39-40; Appellants' Reply Br. at 16-17. These distinctions are invalid because they overlook similarities between the two cases and create distinctions that had nothing to do with the *Snoqualmie* court's rationale.

The environmental groups erroneously assume that the environmental assessment of the project was valid in *Snoqualmie* and was invalid here. In both cases, another agency issued an environmental impact statement for an earlier version of the project. In *Snoqualmie,* the other agency (FERC)

19

evaluated the environmental impact of an earlier version of the project (lowering of the dam). *Snoqualmie Valley*, 683 F.3d at 1158.[12] In our case, another agency also issued an environmental impact statement for an earlier version of the project: construction of an oil pipeline that would have run further northward into Canada. In trying to distinguish the two cases, the environmental groups apparently assume that FERC's environmental impact statement of the earlier project would have obviated the need for a new NEPA review and that the State Department's environmental impact statement of the oil pipeline wouldn't. But why? In both cases, the environmental impact statement addressed an earlier version of the project rather than the one ultimately subject to the Corps' verifications.

Perhaps for that reason, the court in *Snoqualmie* did not rely in any way on FERC's issuance of an environmental impact statement for the earlier project. The court merely mentioned the environmental impact statement in one sentence of the background facts. *Id.* The court explained that there was no need for a new NEPA analysis at the verification stage because of the limited purpose of a verification letter: At that point, the Corps' only function is to verify that the project is covered by the

---

[12]   In *Snoqualmie*, the Corps also conducted a separate environmental assessment of an earlier version of the project. *Snoqualmie Valley*, 683 F.3d at 1158.

nationwide permit. *Id.* at 1164. In light of that limited purpose for verification, the court concluded: "Verifying that permittees may properly proceed under a nationwide permit does not require a full NEPA analysis at the time of verification." *Id.*

That is also true here. In issuing the verifications, the Corps simply confirmed that TransCanada's activities would fall within the terms of Nationwide Permit 12. There would have been little reason for the Corps to conduct a new NEPA analysis at that point. Another NEPA analysis was unnecessary in *Snoqualmie* and was unnecessary here.

**2.     Scope of Analysis**

The environmental groups also argue the Corps should have evaluated the impacts of the entire pipeline project because the agency had "control and responsibility" over that project. In support, the environmental groups rely on the Corps' NEPA implementation regulations, codified at 33 C.F.R. § 325, Appendix B.

We disagree for two reasons:

1.     Appendix B does not apply to the verification process.

2.     Even if Appendix B applied, the environmental groups have not shown that the Corps would have had sufficient "control and responsibility" over the pipeline project.

Appendix B does not apply to the verification process. In adopting Appendix B, the Corps indicated that Appendix B would not apply to nationwide permits (or verifications of permit coverage) when it issued the

21

appendix. *See* Environmental Quality; Procedures for Implementing the National Environmental Policy Act (NEPA), 53 Fed. Reg. 3120-01, 3126 (Feb. 3, 1988).[13] We defer to the Corps' interpretation unless it is plainly erroneous or inconsistent with Appendix B. *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 708 n.3 (6th Cir. 2014).

We do not regard the Corps' interpretation as plainly erroneous or inconsistent with the appendix. The appendix was apparently designed to guide Corps officials in evaluating permit applications for individual

---

[13] During the comment period for Appendix B, commenters suggested that the Corps categorically exclude verifications from NEPA documentation. *See* Environmental Quality; Procedures for Implementing the National Environmental Policy Act (NEPA), 53 Fed. Reg. 3120, 3126 (Feb. 3, 1988) ("Several suggested regional and nationwide general permits should be added to the list."). The Corps responded that the exclusion was not necessary:

> The regional and nationwide general permits are permits for certain types of activities for which there has already been a NEPA review and NEPA documents have already been prepared on a generic basis. Therefore, it is not necessary to add them to the list of actions categorically excluded from NEPA documentation.

*Id.* Thus, the agency chose not to categorically exclude verifications from the NEPA process. *See* 33 C.F.R. § 325, Appendix B(6) (2012).

projects,[14] not to evaluate whether a project qualified under an existing nationwide or regional permit.

### 3. The Corps' Supposed Mistake

The environmental groups argue that the Corps issued the nationwide permit under the mistaken belief that another agency would prepare an environmental impact statement. Appellants' Opening Br. at 40.

This argument is based on a selective quotation from the Corps' decision document addressing issuance of the nationwide permit. There the Corps noted that one commenter had asked if someone would need an individual permit for an activity covered by Nationwide Permit 12 "when a Corps district participates as a cooperating agency for an environmental impact statement." Appellants' App. at 517. Under federal regulations, an agency can serve as a "cooperating agency" only if another agency serves as the "lead agency." 40 C.F.R. §§ 1501.6, 1508.5 (2012). Thus, the question assumed that another agency would serve as the lead agency and retain responsibility for issuing an environmental impact statement.

The Corps answered the commenter's question, noting that the lead agency would address non-aquatic environmental impacts when the Corps

---

[14] *See, e.g.*, 33 C.F.R. § 325, Appendix B(7)(a) (2012) (explaining how a district engineer should evaluate an "applicant's proposal" when preparing a NEPA document); *id.*, Appendix B(7)(b) (explaining how district engineers should define the scope of a NEPA document when a "permit applicant" proposes to conduct "a specific activity requiring a Department of the Army . . . permit").

23

served as a cooperating agency. Appellants' App. at 517. The Corps did not suggest that other agencies would address non-aquatic impacts whenever someone undertook an activity authorized by the nationwide permit.

### 4. Summary

In issuing the verification letters, the Corps did not violate NEPA. The verifications were not "major Federal actions" that would require NEPA review, and the Corps had no obligation to assess the environmental impacts of the entire Gulf Coast Pipeline.

## III. Clean Water Act

Section 404(e) of the Clean Water Act authorizes the Corps to issue nationwide permits when dredge-and-fill activities would result in minimal adverse environmental effects. 33 U.S.C. § 1344(e)(1) (2012). According to the environmental groups, Nationwide Permit 12 violates § 404(e) by

- authorizing linear projects with substantial environmental impacts and

- deferring part of the minimal-impacts determination to project-level personnel.

We reject both arguments. The environmental groups have not shown that the permit authorizes linear projects with more-than-minimal impacts, and the Corps has permissibly interpreted the statute to allow partial deferral of its minimal-impacts analysis.

## A.    Utilization of the Permit

The environmental groups argue that the nationwide permit allows activities with more-than-minimal impacts. We disagree.

The Corps has concluded that the environmental impacts would be minimal. *See* Appellants' App. at 530, 535, 544, 553. This conclusion involved the agency's technical expertise. *See Utah Envtl. Congress v. Richmond*, 483 F.3d 1127, 1140 (10th Cir. 2007).

The environmental groups question that conclusion. Because this conclusion is based on technical expertise, the environmental groups face a heavy burden. *Balt. Gas & Electric Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). They must show that the Corps' minimal-impact determination lacked any "substantial basis in fact." *Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453, 463 (1972). The environmental groups have not met this burden.

They assert that TransCanada can use the permit limitless times for a single linear project. The Corps disagreed, concluding that it could assure minimal impact by applying the existing standard (loss of ½ acre of U.S. waters) to each water crossing as long as it was "separate and distant." Appellants' App. at 508, 513-14.

In arriving at this conclusion, the Corps explained that it had a long-standing practice of calculating the ½-acre threshold "separately for each separate and distant crossing." *Id.* at 513; *see* Regulatory Guidance Letter

25

88-06, at 1, 3 (June 27, 1988), http://www.usace.army.mil/Portals/2/docs/ civilworks/RGLS/rgl88-06.pdf. Applying this standard, the Corps determined that the project would result in the loss of only 0.63 acres of wetlands. Appellants' App. at 647, 2506. Thus, the Corps effectively found that the total loss in wetlands, over more than 2,000 water crossings, was only slightly larger than the loss permitted for each separate and distant crossing. And even for these losses, TransCanada had to buy credits from a wetlands mitigation bank. *Id.* at 647-48.

The environmental groups challenge the use of this test (whether the crossings are "separate and distant"). But the environmental groups have not shown that the Corps failed to adequately control aquatic impact by allowing multiple uses of the ½-acre test for "separate and distant" crossings. The Corps' use of the "separate and distant" test was not arbitrary or capricious. *See Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1269-73 (10th Cir. 2004) (holding that the Corps' granting of a § 404 permit was not arbitrary or capricious even though the project would eliminate 1.45 acres of wetlands).

### B.    Partial Deferral of Analysis

As discussed, a § 404 permit allows the Corps to authorize an activity only if the environmental impact would be minimal. *See* 33 U.S.C. § 1344(e) (2012). In deciding to issue Nationwide Permit 12, the Corps analyzed the environmental impacts of dredge-and-fill activity related to

26

utility-line construction. Appellants' App. at 528-35. But in conducting this analysis, the Corps noted that its analysis had to entail some level of speculation about future operations. *Id.* at 528. Thus, the Corps added safeguards involving the use of project-level personnel, requiring them to ensure that particular activities would not have more than a minimal impact on the aquatic environment. *Id.*

The environmental groups argue the Corps violated § 404(e) by partially deferring the minimal-impact determination. We disagree. The Corps permissibly interpreted § 404(e) to allow establishment of additional safeguards through the use of project-level personnel.

## 1. Standard of Review (*Chevron*)

The environmental groups have questioned the Corps' interpretation of the Clean Water Act. We review this contention under the two-part test stated in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984).[15] Under *Chevron*, we first ask whether Congress has directly spoken on the issue. *Chevron*, 467 U.S. at 843-44. If Congress has not directly spoken, we ask whether the Corps' interpretation of the Clean Water Act is permissible. *See id.* If the Corps' interpretation is permissible, we must defer to that interpretation. *Id.* at 844.

---

[15] *Chevron* deference is appropriate because the Corps administers § 404(e) of the Clean Water Act. 33 U.S.C. § 1344(e) (2012); *City of Arlington v. F.C.C.*, __ U.S. __, 133 S. Ct. 1863, 1868 (2013).

## 2.   Step One of *Chevron*: Ambiguity of § 404(e)

We first ask: Has Congress directly spoken on whether the Corps can assign project-level personnel the task of ensuring minimal impact on the environment? On this issue, Congress has not directly spoken.

Under § 404(e), the Corps must ensure that the authorized activities have only minimal environmental impact. *See* 33 U.S.C. § 1344(e) (2012). But § 404(e) does not specify how or when the Corps must make its minimal-impact determination. By omitting these aspects of the determination, Congress presumably authorized the Corps to fill in the gaps. *See City of Arlington v. F.C.C.*, __ U.S. __, 133 S. Ct. 1863, 1868 (2013) ("Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion."); *see also Catawba Cnty., N.C. v. E.P.A.*, 571 F.3d 20, 35 (D.C. Cir. 2009) (explaining that ambiguity in the statutory text "suggest[s] a congressional intent to leave unanswered questions to an agency's discretion and expertise"). Thus, § 404(e) does not clarify whether the Corps can defer part of its minimal-impact analysis.[16]

---

[16]   The environmental groups argue that partial deferral violates the "unambiguously expressed intent of Congress" for two reasons:

1.   Nationwide permits are final actions that "mark[] the completion of the decision-making process"; thus, the Corps must finalize the minimal-impact determination before issuing such permits.

**3.    Step Two of *Chevron*: Permissibility of Interpretation**

Because Congress has not directly spoken on this issue, we ask: Has the Corps permissibly interpreted § 404(e) to allow partial deferral of the minimal-impact determination? The Corps' interpretation is permissible based on the text of § 404(e) and the difficulty of predicting the impact of activities allowed under nationwide permits.

**a.    Text of § 404(e)**

We first consider the language in § 404(e). *See United States v. Hubenka*, 438 F.3d 1026, 1032-33 (10th Cir. 2006) (analyzing an interpretation of the Clean Water Act to determine whether the Corps' interpretation of Act was permissible). This language reflects an acknowledgment that the Corps might need to police the use of a permit to ensure that the environmental impact is minimal, for § 404(e)(2) recognizes the possibility that authorized activities could result in more-

_____

2.    Partial deferral would deny the public the opportunity to meaningfully comment on proposed nationwide permits.

Appellants' Opening Br. at 44-45. But these arguments do not address whether Congress has directly spoken on the issue, which is our only concern at step one of *Chevron*. *See United States v. Hubenka*, 438 F.3d 1026, 1031 (10th Cir. 2006); *see also Aragon-Salazar v. Holder*, 769 F.3d 699, 706 (9th Cir. 2014) ("Using extrinsic policy considerations to determine whether there is statutory ambiguity is plainly contrary to Supreme Court precedent on both *Chevron* step one and statutory interpretation more generally."). Thus, we reject these arguments as to step one and will instead address them at step two. *See* pp. 34-35, below.

than-minimal impacts. For example, this section authorizes revocation or modification of a nationwide permit if the Corps "determines that the activities authorized by [the permit] have an adverse impact on the environment." 33 U.S.C. § 1344(e)(2) (2012). The Corps could reasonably conclude that project-specific review by district engineers would facilitate the decision whether to revoke or modify a nationwide permit.

### b.  Difficulty of Fully Predicting the Impact

The Corps could have recognized the difficulty of predicting impacts from all future activities falling within Nationwide Permit 12. Thus, the Corps' interpretation of § 404(e) supplies a reasonable way of safeguarding the environment from unforeseen impacts. In similar circumstances, the Fourth Circuit Court of Appeals upheld the use of project-level personnel in *Ohio Valley Envtl. Coal. v. Bulen*:

> [I]t is impossible for the Corps' *ex ante* determinations of minimal impact to be anything more than reasoned predictions. Even under the paradigmatic general permit envisioned by the district court, where the parameters of the authorized activities are delineated in objective, measurable terms, the Corps' minimal-impact determinations would necessarily be a forecast only. This is so because the environmental impact of the activities authorized by a general permit depends on factors that, as a practical matter, are outside the Corps' ability to predict with certainty *ex ante*. This uncertainty is especially acute when the Corps issues a *nationwide* permit like [Nationwide Permit] 21 because the Corps must attempt to forecast the environmental effects the authorized activities could have if undertaken anywhere in the country under any set of circumstances.

429 F.3d 493, 501 (4th Cir. 2005).

Though we are not bound by *Bulen*, we regard it as persuasive. Nationwide Permit 12, like all nationwide permits, governs a broad range of activities that can be undertaken anywhere in the country under a wide variety of circumstances. For example, Nationwide Permit 12 addresses the construction, maintenance, repair, and removal of all utility lines throughout the nation. Appellants' App. at 508. In considering how to address this range of activities, the Corps noted that utility lines are used in a variety of ways, carrying resources (like water, fuel, and electricity), facilitating communication (like telephone lines, internet connections, and cable television), and removing waste. *Id.* at 527. The Corps ultimately adopted a set of conditions reflecting the foreseeable effects of activities authorized by the nationwide permit. *Id.* at 528. But the Corps recognized that this assessment was inherently speculative:

> The issuance of [a nationwide permit] is based on a general assessment of the effects on public interest and environmental factors that are likely to occur as a result of using this [nationwide permit] to authorize activities in waters of the United States. As such, this assessment must be speculative or predictive in general terms. Since [nationwide permits] authorize activities across the nation, projects eligible for [nationwide permit] authorization may be constructed in a wide variety of environmental settings. Therefore, it is difficult to predict all of the indirect impacts that may be associated with each activity authorized by [a nationwide permit].

*Id.*

31

The environmental groups argue that *Bulen* is distinguishable because there (1) another agency (the Department of Interior) would evaluate the activity to be regulated (operation of coal mines), and (2) the Corps undertook a comprehensive analysis of the impacts from the authorized activities. These distinctions are misguided.

The first distinction is based on a single sentence in *Bulen*. In this sentence, the Fourth Circuit Court of Appeals summarized the nationwide permit, pointing out that it had authorized discharges of dredged or fill material associated with surface coal mining and reclamation operations "so long as those operations [we]re authorized by the Department of Interior" or satisfied the requirements for programs under the Surface Mining Control and Reclamation Act of 1977. *Bulen*, 429 F.3d at 498. The court did not refer again to the Department of Interior's regulation or give any indication that these regulations affected the holding or rationale. *See id. passim.*[17]

---

[17]   If the Corps had relied on additional regulations by the Department of Interior, the same would have been true here. The Federal Energy Regulatory Commission oversees regulatory regimes for oil pipelines and the Department of Transportation's Pipeline and Hazardous Materials Safety Administration regulates pipeline safety. James J. Monast, Brooks R. Pearson & Lincoln F. Pratson, *A Cooperative Federalism Framework for LCS Regulation*, 7 ENVTL. & ENERGY L. & POL'Y J. 1, 23-24 (2012).

The Fourth Circuit Court of Appeals also noted that the Corps had assessed the environmental impacts from a broad range of activities. *Id.* at 499. But the court noted that the Corps' assessment was inherently speculative because of the variety of ways that coal miners might invoke Nationwide Permit 21. *Id.* at 501.

The same is true of Nationwide Permit 12. When considering whether to issue this permit, the Corps analyzed the environmental impacts of activities involving utility lines. But the Corps pointed out that its task was complicated by the variety of ways that companies might undertake to construct, maintain, repair, and remove utility lines. Appellants' App. at 527-28.

The environmental groups complain that in doing so, the Corps failed to evaluate the environmental impacts from oil pipeline projects like this one. How could the Corps have done that? After all, the Corps had issued Nationwide Permit 12 before TransCanada proposed this pipeline. *See* Appellants' Reply Br. at 13 (arguing, in a different context, that TransCanada decided to divide the Keystone XL Pipeline into two parts only after the comment period had closed for Nationwide Permit 12). In fact, the environmental groups argue "that [Nationwide Permit 12] was not meant for these major oil pipelines." *Id.* If no one contemplated that Nationwide Permit 12 would cover major oil pipelines, why would the Corps have considered the environmental impacts from a major oil

33

pipeline? And if the Corps did consider these impacts, how would it have assessed the environmental impact from this particular pipeline?

The problem, as the *Bulen* court explained, is that nationwide permits are inherently broad and could cover a variety of activities. *Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493, 501 (4th Cir. 2005). The agency might predict some of these activities, but not others. Thus, the Corps predicted how companies might use the nationwide permit and assessed the environmental impacts from those uses. Appellants' App. at 528. In *Bulen*, however, the court recognized that this assessment had to entail some level of speculation. *Bulen*, 429 F.3d at 501.

The same is true here. The Corps made an environmental assessment of the predictable uses of Permit 12, but recognized the futility of predicting every conceivable use for every conceivable type of utility line anywhere in the United States. The Corps need not conduct a new NEPA analysis every time someone conceives a new use for a national permit.

c.     **Arguments Against the Corps' Interpretation**

The environmental groups argue that partial deferral is not permissible under § 404(e) for two reasons:

1.     The Corps must finalize minimal-impact determinations before issuing nationwide permits because the permits are final agency actions.

2.     Partial deferral would restrict the public's ability to meaningfully comment on proposed permits.

34

We reject both arguments. Finality is not relevant here, and partial deferral would not restrict the public's ability to comment.

First, finality of the nationwide permit does not bear on whether the Corps could enhance its environmental protection by assigning additional oversight responsibilities to project-level personnel. Finality bears only on whether the permit is reviewable under the Administrative Procedure Act, and no one has questioned jurisdiction. *See McKeen v. U.S. Forest Serv.*, 615 F.3d 1244, 1253 (10th Cir. 2010) ("Pursuant to the APA, we have jurisdiction to review only 'final agency actions.'").

Second, partial deferral would not restrict the public's ability to comment on proposed permits. *See* 33 C.F.R. 325.3 (2012) (stating that the Corps must provide the public with "sufficient information to give a clear understanding of the nature and magnitude of [proposed] activit[ies] to generate meaningful comment"). For every proposed permit, the Corps must prepare a written evaluation of all potential impacts of authorized activities. 33 C.F.R. § 230.7 (2012). The Corps has deferred only those aspects of the evaluation that cannot practically be undertaken before a project is underway. Thus, the impact on opportunities for public comment would not preclude the Corps from interpreting § 404(e) in a way that would allow oversight by project-level personnel.

### d.    Summary

For these reasons, we conclude that the Corps has permissibly interpreted § 404(e) to allow use of project-level personnel to evaluate environmental impacts. The Corps' interpretation is consistent with the text and practicalities of § 404(e).

## IV.    Nationwide Permit 12

Finally, the environmental groups argue that the Corps violated the terms of its own permit by failing to document analysis of cumulative impacts in the verification letters or administrative record.

We disagree. Though district engineers must analyze cumulative impacts, the engineers need not include a written analysis of cumulative impacts within the verification letters. Though this analysis is absent in the letters, it appears in the record. Thus, we conclude that the Corps' issuance of the verification letters was not arbitrary or capricious.[18]

---

[18]    The environmental groups also state in their heading that the verification letters violated the Clean Water Act. *See* Appellants' Opening Br. at 48. But the environmental groups have not developed this argument beyond the heading. Because this argument has not been developed, it is waived. *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 841 (10th Cir. 2005) ("Issues will be deemed waived if they are not adequately briefed." (citing *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1175 (10th Cir. 2002))).

## A.    Verification Letters

The environmental groups argue that the agency issued the letters in violation of the nationwide permit by not including a cumulative-impacts analysis. We disagree.

The Corps has directed district engineers to analyze the cumulative impacts of proposed projects when reviewing pre-construction notifications. *See* Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, 10,186 (Feb. 21, 2012). But, the Corps has not required district engineers to include a written cumulative-impacts analysis in the verification letters. Thus, district engineers could have verified compliance without stating how they had analyzed the cumulative impacts. *See Snoqualmie Valley Pres. Alliance v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155, 1163 (9th Cir. 2012) (per curiam) (concluding that verification letters need not go beyond the base findings if the verification letters are supported by the record).

## B.    Record of the Analysis

The environmental groups also argue that the record does not show cumulative-impact analyses by the district engineers. We disagree, for the record shows that district engineers analyzed the cumulative impacts of the proposed crossings.

We will uphold the verifications as long as we can discern that the agency adequately considered cumulative impacts. *See Licon v. Ledezma*, 638 F.3d 1303, 1308 (10th Cir. 2011) ("We will 'uphold a decision of less

37

than ideal clarity if the agency's path may be reasonably discerned.'"

(quoting *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007))).

We can reasonably discern that district engineers considered cumulative impacts of the proposed crossings. For instance, the record shows three facts:

1. District engineers prepared verification memoranda[19] that describe the Corps' analysis of pipeline impacts, impose special conditions to ensure minimal impacts, and conclude that the pipeline (with proposed mitigation) would "result in no more than minimal individual and cumulative adverse environmental effects . . . ."[20]

2. The verification letters state that district engineers analyzed "[a]ll proposed crossings" of the pipeline "relative to the definition of single and complete project for linear projects."[21]

3. Corps officials from separate districts communicated about the pipeline's verification to ensure that officials had necessary

---

[19] The environmental groups suggest that the memoranda are deficient because they rely on an outdated standard ("Condition 27(e)") after it had been replaced. But the district court held that the environmental groups had waived this argument by failing to raise it until the reply brief on summary judgment. We conclude that the district court acted within its discretion in applying the local rule. *See Bylin v. Billings*, 568 F.3d 1224, 1230 n.7 (10th Cir. 2009) (stating that we owe considerable deference to a district court's interpretation and application of its own local rules). Thus, we will not address this argument on appeal.

[20] Appellants' App. at 1728, 1741, 1770.

[21] *E.g.*, Appellants' App. at 1760 ("Scope of Analysis").

information and had fully considered the pipeline's collective impact.[22]

Based on the combination of these three facts, we can reasonably discern that the agency analyzed the cumulative impacts of the proposed crossings. Accordingly, the Corps' issuance of the verification letters was not arbitrary or capricious.

## V. Conclusion

In conclusion, we affirm the entry of judgment for the defendants. In Nationwide Permit 12, the Corps did not violate NEPA or the Clean Water Act, and the agency did not issue the verification letters in violation of NEPA or the nationwide permit.

---

[22] Appellants' App. at 2190-2210.

*Sierra Club, Inc. v. Bostick*, No. 14-6099

**BALDOCK**, J., concurring.

With the exception of Footnote 3, I join the Court's clear and concise opinion. I write separately because I believe we should have found this case to be prudentially moot.

"A case is prudentially moot if circumstances have changed since the beginning of litigation that forestall any occasion for meaningful relief." *Citizen Ctr. v. Gessler*, 770 F.3d 900, 909 (10th Cir. 2014) (citation and internal marks omitted). Or, "a court may dismiss the case under the prudential-mootness doctrine if the case is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1121 (10th Cir. 2010) (citation and internal marks omitted). Utilizing its discretion, the Court "elect[s] not to address prudential mootness." Slip. Op. at 5 n.3. Counseling strongly against this maneuver is *Hillsdale Environmental Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156 (10th Cir 2012).

In *Hillsdale*, as here, environmental groups challenged a Corps-issued permit under the National Environmental Policy Act (NEPA) and the Clean Water Act (CWA), and prudential concerns were raised. We were not persuaded by those concerns in *Hillsdale*, but our reasoning there points directly to the present affair. Specifically, in *Hillsdale* we had "no trouble" rejecting NEPA mootness concerns because the facility in question was "not yet complete." *Id.* at 1167. Here, the pipeline has been complete and operational for *years*. Moreover, in *Hillsdale* we said CWA mootness was a much "closer question" where "[n]early all of the jurisdictional waters . . . have been filled, and nearly all of the associated

mitigation is now complete." *Id.* Here, *all* the waters have been filled or rerouted and *nearly all* associated mitigation is complete. Given *Hillsdale*'s language, I have a difficult time imagining a scenario more appropriate for prudential mootness than the present.

Having said this, I acknowledge that prudential mootness is a matter of discretion and that reasonable minds can certainly differ on what is prudent here. As such, I readily join the Court in resolving this matter on other grounds.

No. 14-6099, *Sierra Club, Inc. v. Bostick*

**McHUGH**, Circuit Judge, concurring:


I agree with the majority's resolution of this case and I join most of its thoughtful analysis. But I write separately to discuss the Corps' compliance with its obligations under NEPA because my view of this issue differs from that of the majority.

The Corps argues it fully complied with its obligations under NEPA when it reissued Nationwide Permit 12 (NWP 12) because it "thoroughly considered the individual and cumulative impacts of activities within its jurisdiction: discharges of dredged and fill material into waters of the United States under the terms of NWP 12." As support for that position, the Corps argues its "determination to focus primarily on the environmental impacts of discharges of dredged and fill material associated with the category of utility lines, without delving into the particulars of how those utility lines would operate, was reasonable and fully consistent with [§ 404(e) of the CWA]." Thus, the Corps attempts to limit the scope of its NEPA analysis when reissuing NWP 12 to the consideration of only those environmental impacts occurring within jurisdictional waters as a result of the discharge of dredged and fill material. By doing so, the Corps conflates its obligations under NEPA with its obligations under § 404(e) of the CWA. But nothing in the text of NEPA allows the Corps to limit its analysis in such a manner.

When the Corps' issuance of a permit under § 404(e) of the CWA constitutes a major federal action, as is the case with the issuance or reissuance of a nationwide permit, it must comply with the requirements of *both* the CWA and NEPA. The CWA permits

the Corps to issue a nationwide permit if it "determines that the activities [authorized by the permit] are similar in nature, will only cause minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). When the Corps issues such permits, it must do so in accordance with guidelines issued by the EPA. *Id.*; *see also id.* § 1344(b)(1); 40 C.F.R. § 230. These CWA guidelines make clear that the Corps' cumulative effects analysis under § 404(e) of the CWA is limited to an analysis of "the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material." 40 C.F.R. § 230.11(g)(1). Thus, the Corps' environmental analysis under the CWA may be properly limited to the aquatic impacts associated with the discharge of dredge and fill material.

In contrast, NEPA requires a significantly broader scope of analysis. The Council on Environmental Quality (CEQ) is tasked with interpreting NEPA and establishing regulations governing agencies' responsibilities under the statute. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 354 (1989). CEQ regulations require federal agencies to consider all of the reasonably foreseeable direct, indirect, and cumulative effects of an agency's action. 40 C.F.R. §§ 1508.7, 1508.8. Direct effects "are caused by the action and occur at the same time and place." *Id.* § 1508.8(a). Indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative effects are "impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions *regardless of what agency*

2

*(Federal or non-Federal) or person* undertakes such other actions." *Id.* § 1508.7 (emphasis added). Thus, NEPA requires agencies to consider all of the reasonably foreseeable environmental effects caused by their major federal actions.

Courts have consistently held that the Corps' NEPA obligations when issuing a § 404 dredge and fill permit—which constitutes a major federal action—extend beyond consideration of the effects of the discharge of dredged or fill material in jurisdictional waters. Indeed, courts routinely require the Corps to consider the direct, indirect, and cumulative effects—including nonaquatic effects—of the *installations* the Corps' dredge and fill permits authorize. For example, in *Hillsdale Environmental Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, we considered the validity of the Corps' NEPA analysis when issuing a § 404 dredge and fill permit for the construction of an intermodal rail/truck terminal. 702 F.3d 1156, 1162–63 (10th Cir. 2012). In its NEPA analysis, the Corps "considered both [the] direct and reasonably foreseeable indirect impacts to land use, air quality, noise, traffic, water quality, threatened and endangered species, and cultural resources" from the operation of the intermodal terminal. *Id.* at 1164. Far from limiting its analysis to the impact of dredged and fill material on jurisdictional waters, the Corps conducted a broad environmental assessment. And we upheld the Corps' NEPA analysis *because* it had properly considered all of the environmental impacts of the intermodal terminal, not only the aquatic impacts associated with the discharge of dredged and fill material. *Id.* at 1172–77. As such, we have recognized that a NEPA environmental assessment requires the Corps to look beyond the effects occurring directly within its jurisdictional waters. *See Utahns for Better Transp. v. U.S. Dep't of*

3

*Transp.*, 305 F.3d 1152, 1190–91 (10th Cir. 2002) (recognizing that the CWA defines "cumulative impacts" more narrowly than does NEPA).

Other courts similarly require the Corps to look beyond the effects of the discharge of dredged and fill material. The Ninth Circuit's analysis in *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2004), is particularly instructive. In that case, the Corps issued a § 404 dredge and fill permit to a developer building a gated community near Phoenix. *Id.* at 1118–19. The development required Corps approval because several desert washes—which filled with water during the rainy season—intersected the proposed development site. *Id.* at 1118. The Corps prepared an environmental assessment and found the development would have no significant impact. *Id.* "In reaching this conclusion, the Corps examined only the washes rather than the entire project." *Id.* On appeal, the Ninth Circuit considered whether "the Corps had improperly constrained its NEPA analysis to the washes, rather than considering the development's effect on the environment as a whole." *Id.* at 1121. The court stated:

> Although the Corps' permitting authority is limited to those aspects of a development that directly affect jurisdictional waters, it has responsibility under NEPA to analyze all of the environmental consequences of a project. *Put another way, while it is the development's impact on jurisdictional waters that determines the scope of the Corps' permitting authority, it is the impact of the permit on the environment at large that determines the Corps' NEPA responsibility.* The Corps' responsibility under NEPA to consider the environmental consequences of a permit extends even to environmental effects with no impact on jurisdictional waters at all.

*Id.* at 1122 (emphasis added). Thus, the Ninth Circuit held the Corps had improperly limited the scope of its NEPA analysis to the considerations relevant to issuing a permit under the CWA. *Id.* at 1123.

4

My understanding of the scope of the Corps' responsibility under NEPA parallels that of the Ninth Circuit. The Corps may not limit its NEPA analysis to the consideration of the environmental effects of the discharge of dredged and fill material into jurisdictional waters, as would be appropriate under § 404(e) of the CWA. Rather, for NEPA purposes, the Corps is required to consider the direct, indirect, and cumulative effects reasonably foreseeable as a result of its permitting decision. This includes the environmental effects caused by the operation of the installations authorized by the Corps' permitting decision. And this understanding of the Corps' NEPA responsibilities has been universally adopted.[1] *See, e.g.*, *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 232–34 (5th Cir. 2007) (holding Corps' environmental assessment of proposed subdivision insufficient when it failed to properly evaluate adverse effects on area's flood capacity due to increased pavement, increases in non-point source pollution from increased run-off, loss of habitat for non-aquatic wildlife, and adverse effects associated with increased vehicle traffic); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2004) (holding Corps had NEPA obligation to consider effects of increased oil tanker traffic and increased risk of oil spills when issuing § 404 permit for construction of oil refinery dock); *Sierra Club v. Marsh*, 769 F.2d 868, 877–78 (1st Cir. 1985) (holding Corps' environmental assessment insufficient for failure to consider

---

[1] Although most of these decisions involve the issuance of individual permits, they address the scope of the Corps' NEPA review, which is triggered by any permitting decision that qualifies as a major federal action. The issuance or reissuance of a nationwide permit is a major federal action that must comply independently with NEPA. *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1276 (11th Cir. 2015).

future industrial development when issuing § 404 permit for construction of a port and causeway). *See also Pres. Soc. of Charleston v. U.S. Army Corps of Eng'rs*, No. 2:12-2942-RMG, 2013 WL 6488282, at \*12 (D.S.C. Sept. 18, 2013) (rejecting Corps' attempt "to justify what amounted to essentially a non-review of the proposed passenger terminal on the basis that its jurisdiction is limited to the portion of the project physically touching the navigable waters of the United States"); *Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1237, 1242 (D. Wyo. 2005) (rejecting Corps' argument that it was not obligated to consider cumulative impacts on non-wetland areas of regional permit authorizing dredge and fill associated with coalbed methane gas production); *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 37–41 (D.D.C. 2000) (holding Corps was required to consider adverse effects associated with increased sewage, increased wastewater runoff, creation of large shaded areas on the aquatic habitat, creation of a "sump" that would trap aquatic wildlife, increased draw on area aquifers, and increased upland development when issuing § 404 permit for dredge and fill associated with construction of floating casino barges); *Hoosier Envtl. Council, Inc. v. U.S. Army Corps of Eng'rs*, 105 F. Supp. 2d 953, 972–75 (S.D. Ind. 2000) (upholding Corps' environmental assessment when it properly considered the indirect effects of § 404 permit for construction of riverboat gambling facility, including construction of a hotel, pavilion, golf course, and parking facilities). Thus, when reissuing NWP 12, the Corps was required to consider all of the environmental effects reasonably foreseeable as a result of its permitting decision.

Moreover, I am convinced the failure to consider any environmental impacts beyond those associated with the discharge of dredged and fill material would have been, and in fact was, obvious to the Corps during the reissuance process so that no party was required to bring the defect to the Corps' attention. *See Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 765 (2004) (noting the flaws in an agency's environmental assessment "might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action"). In its response to comments in the final notice on the reissuance of NWP 12, the Corps specifically acknowledged that "NEPA requires consideration of all environmental impacts, not only those to aquatic resources, so there may well be situations where aquatic impacts are minimal even though environmental impacts more generally are not." Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, 10,197 (Feb. 21, 2012). Given this explicit acknowledgement, the Corps cannot now take the contrary position that it satisfied its NEPA obligations when it focused exclusively on the aquatic impacts associated with the discharge of dredged and fill material. Accordingly, I would hold that the Corps' NEPA analysis on the reissuance of NWP 12 was obviously flawed.

But the Corps attempted to address this deficiency by deferring portions of the required NEPA analysis to whatever agency took the lead for a given utility line project or to the district engineer at the verification stage. *Id.* ("These other environmental impacts would be addressed by the lead agency preparing the environmental impact statement. The district engineer will exercise discretionary authority to require an individual permit for any utility line activity that he or she determines does not meet the

7

terms and conditions of NWP 12."). For example, the environmental assessment for

NWP 12 states:

> Division and district engineers will conduct more detailed assessments for geographic areas that are determined to be potentially subject to more than minimal cumulative adverse effects. Division and district engineers have the authority to require individual permits in watersheds or other geographic areas where the cumulative adverse effects are determined to be more than minimal, or add conditions to the NWP either on a case-by-case or regional basis to require mitigation measures to ensure that the cumulative adverse effects are minimal.

> U.S. Army Corps of Eng'rs, *Decision Document Nationwide Permit 12* at 27

(2012) [hereinafter *Decision Document*]. [2] The assessment also provides that the "pre-

construction notification requirement allows district engineers to review proposed

activities on a case-by-case basis to ensure that the individual and cumulative adverse

effects of those activities on the aquatic environment are minimal." *Id.* at 22. Thus, the

Corps' own environmental assessment undermines the argument it makes before us

now—that it fully complied with its NEPA obligations at the time it reissued NWP 12. [3]

To be sure, accounting in advance for the broad range of possible impacts

resulting from the wide variety of utility lines authorized under NWP 12 is a daunting

task. But compliance with NEPA is not excused simply because compliance is difficult.

And the problem was exacerbated by the Corps' decision to draft a nationwide permit

that defines utility lines expansively. Reissuance of Nationwide Permits, 77 Fed. Reg. at

---

[2] The *Decision Document* is available on the Corps' website at http://www.usace.army.mil/Portals/2/docs/civilworks/nwp/2012/NWP_12_2012.pdf.

[3] To my mind, the Corps' attempt at deferring portions of its cumulative effects analysis serves as a tacit admission that it did not conduct a full NEPA analysis at the time of reissuance.

10,271–72 ("A 'utility line' is defined as any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose, and any cable, line, or wire for the transmission for any purpose of electrical energy, telephone, and telegraph messages, and radio and television communication."). The Corps could have decreased the difficulty of its NEPA analysis by crafting a narrower set of permits, focusing on particular types of utility line projects.[4] By issuing narrower permits focusing on particular industrial processes, the Corps could better assess all of the environmental impacts of the processes themselves, as required by NEPA. Accordingly, I would hold the Corps impermissibly restricted the scope of its NEPA analysis when it considered only the effects of the discharge of dredged and fill material when reissuing NWP 12.

Nevertheless, I remain unconvinced that the Corps can permissibly defer any portion of its NEPA analysis to the verification stage. First, NEPA requires agencies to complete their environmental analysis at the point of agency action—in this case, the reissuance of NWP 12. *See Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1178 (10th Cir. 2008) (noting that NEPA requires agencies to "take a hard look at the environmental consequences *before* taking a major action" (emphasis added) (internal quotation marks omitted)); *see also Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 409 (6th Cir. 2013) (rejecting as "nonresponsive" the Corps' argument that district engineers would assess required NEPA elements in greater detail at the verification stage). It is

---

[4] The Corps has issued industry-specific NWPs in other cases. *See, e.g.*, Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, 10,274 (Feb. 21, 2012) (Nationwide Permit 21, Surface Coal Mining Activities); *id.* at 10,278 (Nationwide Permit 34, Cranberry Production Activities); *id.* at 10,281 (Nationwide Permit 49, Coal Remining Activities).

9

impossible for an agency to have taken the "hard look" required by NEPA—and thereby have made a fully informed decision to undertake an action—if it knowingly defers portions of its analysis to a later date.

Second, in the context of nationwide permits, it may well be that, as happened here, there is no lead agency that will conduct an environmental assessment. And the NWP 12 environmental assessment expressly contemplates that "[i]ndividual review of each activity authorized by an NWP will not normally be performed, except when pre-construction notification to the Corps is required or when an applicant requests verification that an activity complies with an NWP." *Decision Document* at 4. That is, unless an individual utility line project requires a pre-construction notification, parties are authorized to use NWP 12 without ever notifying the Corps. Thus, in the context of nationwide permits, it is often the case that *no* further environmental analysis is ever contemplated. As such, I would conclude the Corps was not permitted to defer any portion of its NEPA analysis to the verification stage. Rather, the agency was required to fully evaluate all of the required NEPA factors *before* reissuing NWP 12. That did not happen here.[5]

---

[5] CEQ regulations do allow partial deferral of NEPA analyses in certain prescribed circumstances. *See* Council on Envtl. Quality, *Final Guidance for Effective Use of Programmatic NEPA Reviews* (2014), *available at* https://www.whitehouse.gov/sites/default/files/docs/effective_use_of_programmatic_nep a_reviews_final_dec2014_searchable.pdf. But the CEQ's final guidance on programmatic NEPA reviews expressly states that such deferral is only appropriate when the initial NEPA review is subsequently supported by further review on a regional, local, or project specific basis. *Id.* at 26–29. Because I agree with the majority that the Corps is not required to conduct further NEPA analysis at the verification stage, the type of

Nevertheless, I would affirm the district court because I conclude that Sierra Club's argument that the Corps improperly deferred portions of its NEPA analysis to the verification stage was not made to the agency during the reissuance process and is therefore waived. Sierra Club has pointed to no part of the record in which any commenter objected to the Corps' decision to defer parts of its NEPA analysis to the district engineers or prospective lead agency. And although I would conclude that the Corps' failure to consider the full environmental consequences of NWP 12 was an obvious deficiency in its environmental assessment, I cannot conclude that it would have been so obvious to the Corps that it could not defer portions of its analysis to the verification stage that commenters were not required to first raise the concern during the reissuance process. *See Public Citizen*, 541 U.S. at 765. The Corps has been issuing and reissuing NWP 12 for decades, with no party objecting to the deferral practice.

For these reasons, I concur.

---

deferral contemplated by the CEQ's guidance on programmatic NEPA reviews is unworkable in the nationwide permit context.